## Commonwealth *v.* Baird, Appellant.

*Criminal law—Food law—Cold storage eggs—Failure to mark
eggs—Act of May 16, 1913, Sec. 15, P. L. 216.*

A conviction under the Act of May 16, 1913, Sec. 15, P. L. 216,
for failure to mark cold storage eggs in the manner provided by the
act, will be sustained where the defense is that the eggs were not
cold storage eggs, but a qualified chemical expert for the Common-
wealth testifies that he made the experiments for the testing of

cold storage eggs, and states that in his opinion the eggs in question were stale, and that they had been held in storage at a temperature below 40 degrees for a long time, while an expert for the defense who testified hypothetically without having seen the eggs, states that the eggs might have been in the state described even if they had been outside of a cold storage warehouse.

Argued Oct. 23, 1916. Appeal, No. 119, Oct. T., 1916, by defendants, from judgment of Q. S. Blair Co., Jan. T., 1916, Nos. 23-24, on verdict of guilty in case of Commonwealth v. William K. Baird and Ross Klein. Before OR-LADY, P. J., PORTER, HENDERSON, HEAD, KEPHART, TREX-LER and WILLIAMS, JJ. Affirmed.

Indictment for violating the Cold Storage Act of May 16, 1913, Sec. 15, P. L. 216. Before BALDRIGE, P. J.

The facts are stated in the opinion of the Superior Court.

Verdict of guilty upon which the defendants were sentenced to pay a fine of $100 and costs.

*Error assigned* was in refusing to take the case from the jury.

*W. C. Kirk* and *J. F. Sullivan,* for appellants.

*A. H. Woodward,* with him *J. D. Hicks* and *Marion D. Patterson,* District Attorney, for appellee.

OPINION BY HENDERSON, J., March 7, 1917:

The defendants were convicted on indictments charging them with having sold at wholesale eggs, on the outside of the container of which they failed to place a placard containing the words "Wholesome Cold Storage Food," and with having sold cold storage eggs which were not marked with the date when the same were placed in the cold storage warehouse and the date when the same were withdrawn from the said cold storage warehouse in violation of the provisions of the 15th section

of the Act of May 16, 1913. The defendants asked for binding instructions in their favor on the ground that the evidence was insufficient to support a verdict that the merchandise described in the indictments had been in cold storage. This request was refused. The single assignment of error raises the question whether the case should have been submitted to the jury. The Commonwealth relied principally on the testimony of Prof. F. T. Aschman, an experienced chemist, who tested the eggs. The competency of the witness seems not to be questioned. He had extensive practice as a chemist, had made many tests of eggs in various conditions for the purpose of ascertaining their quality and may be regarded a skilled witness. Applying tests which he stated to be scientific and sufficient he testified that in his judgment they were conclusive of the fact that the eggs had been in cold storage for several months. His tests were made by shaking, by "candling," by the extent of the air space in the shell, by the specific gravity and by a chemical test for ammonia known as the "Foilin" test. These tests applied to many of the eggs selected from the case submitted for his examination disclosed the fact in his opinion that the eggs were stale and that they had been held in storage in a temperature below 40 degrees for a long time. Prof. James A. Evans, an expert chemist, who heard the testimony of Prof. Aschman, testified that from the data submitted by the latter his conclusion would be that the eggs were cold storage eggs. Dr. Joseph A. Deghuee, a chemist of large experience, was called as an expert for the defense and testified that "There is no distinctive scientific difference in the result which can be used to show or scientifically prove that a good egg has been in cold storage." According to his opinion there does not seem to be any reasonable prospect of discovering a test or combination of tests which can determine whether an egg has been in cold storage or not because the conditions in a cold storage warehouse are precisely the same in general as the effect of holding eggs for different lengths

278    COMMONWEALTH *v.* BAIRD, Appellant.

of time and under different conditions outside of a cold storage warehouse. The witnesses gave their testimony in detail and the bases for their conclusions, and the effect of their testimony was clearly for the jury. The Commonwealth presented a case which if believed by the jury formed a sufficient foundation for the conviction. The court could not declare that the extensive observations and experiments of the Commonwealth's witness were not credible. It was not unreasonable nor unbelievable that one with the professional experience of Prof. Aschman should be able to determine whether a lot of eggs examined by him were in the chemical and physical condition in which he found them because they had been kept for a greater or less length of time in a low temperature. The same kind of evidence was introduced and relied on by the defendants and no argument has been presented which leads us to believe that it was the duty of the court to say that the testimony was unreliable. Many questions of great importance are determined in judicial proceedings by the testimony of skilled and expert witnesses. It is recognized as one of the legitimate means of establishing facts in proper cases and this we regard as such a case. The evidence for the prosecution was clear, direct and positive and accounted for the condition of the eggs examined. The defendants' expert witness did not see or examine the eggs. He testified theoretically and hypothetically but the evidence did not present a state of facts as to the history of the eggs to which his theories necessarily applied. The eggs were not shown to have been kept in the conditions which according to his testimony would account for their quality when bought from the defendants.

Evidence was introduced for the defense to show that the eggs were part of a car load collected by Armour & Co. in Southern Missouri between October 5, and October 14, 1915, and shipped to the warehouses of that company in Chicago on Oct. 15, 1915; that they were shipped by Armour & Co. to their agents (the defendants) in Al-

toona on the 29th of October and that they were not in cold storage as claimed by the Commonwealth. It was not shown by competent evidence, however, that the eggs sold in Altoona were part of the eggs bought in Missouri. The witness, Tierney, on whom the defendants rely to establish the history of the eggs brought from Missouri, described the process of examining eggs in their plant and stated that the eggs were candled; that about fifty men were employed at that business who candled cold storage and fresh eggs at the same time; that they were sorted into seven different grades or qualities and that this was done in the "egg working room." Speaking of the particular lot of eggs the witness gave this evidence: "Q.—Were they not on the fifth floor? A.—They were in the egg working room. Q.—How do you know that? A.—From the information that I got from the foreman of that egg room. Q.—From what they told you? A.— Yes, sir. Q.—You have not any record to show that? A.—We do not carry our eggs in floors; we carry all the stock in a building. Q.—After they are candled you take them off the sixth floor and put them on the fifth floor preparatory to shipment? A.—Yes, sir. Q.—That was not done with these eggs? A.—Those eggs were brought up to be worked; the different grades are brought down to the fifth floor. Q.—This particular lot of eggs was brought down from the sixth floor to the fifth floor? A.—I cannot say this particular lot......Q.— You then do not know where this particular lot of eggs was kept from the time candled until shipped? A.—Not personally." The witness stated at a further point in his examination that he did not know whether the eggs shipped to Altoona were cold storage eggs or not and no other witness was called to identify them as part of the Missouri eggs. When the car arrived from Missouri it received the office number 7,548, and the witness testified that according to their practice the number of the car followed the contents of the car in their storage rooms; that the cases of eggs from a particular car were piled up

in a place a little apart from the eggs from other cars and that the outside cases of that lot were numbered with the car number. This evidence falls far short of showing that when the eggs from all the cases were removed for the purpose of candling and were again placed in cases their identity was so preserved that it was known the eggs received in Altoona were part of the lot No. 7548. It is evident that the jury did not find in the testimony a sufficient identification of the eggs shipped to Altoona as part of the Missouri eggs and this is not surprising in view of the indefiniteness of the testimony on the subject. The whole question in the controversy being one of fact and the evidence introduced for the Commonwealth being competent there is no warrant for a decision that it was not sufficient. The question was one of fact for a jury.

The judgment is affirmed and the record remitted to the court below to the end that the sentence may be carried into effect.